**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10

11    THE HANOVER INSURANCE CO,              No. C-14-01519 DMR

12              Plaintiff(s),               **ORDER DENYING MOTION TO
                                            DISMISS [DOCKET NO. 15]**
13         v.

14    FREMONT BANK,

15              Defendant(s).
      _____/
16

17         Before the court is a motion to dismiss filed by Defendant Fremont Bank (the "Bank").

18    [Docket No. 15.]  The court held a hearing on the motion on July 31, 2014.  For the reasons stated

19    below and at the hearing, the motion is **denied.**

20                                  **I.  BACKGROUND**

21    **A.  The Bank's Loans to Legg**

22         The Bank made business loans to a construction contractor called Legg, Inc.  Am. Compl.

23    [Docket No. 10] at ¶ 8.  Those loans were secured by collateral that included Legg's accounts

24    receivable.  *Id.*  The Bank recorded a UCC Financing Statement with the California Secretary of

25    State in 2005, and a continuation of the UCC Financing Statement in 2009, to perfect a security

26

27

28

1  interest in the collateral.  *Id.*; *see also* Fremont Bank's Request for Judicial Notice ["FRJN," Docket

2  No. 18] Ex. M (UCC Financing Statements dated April 28, 2005 and October 29, 2009).[1]

**B. Hanover's Involvement with the Bonded Projects**

4      Legg was involved with separate projects for (1) the City of Livermore, for an office

5  remodel, and (2) the Burke Construction Group, Inc., for an expansion of the SDCC.[2]  Am. Compl.

6  at ¶ 7.  Plaintiff Hanover Insurance Co. ("Hanover") is a surety company that issued performance and

7  payment surety bonds on behalf of Legg for the Bonded Projects.  *Id.* at ¶ 7.  Beginning in 2012,

8  Legg experienced financial difficulties and was unable to complete the Bonded Projects or pay

9  subcontractors, suppliers, and laborers on the Bonded Projects.  *Id.* at ¶ 9.  Hanover, in satisfaction

10  of its bonded obligations, coordinated the completion of the Bonded Projects and paid the valid

11  claims of subcontractors, suppliers, and laborers on the Bonded Projects.  *Id.* at ¶ 10.

12      To complete the Livermore Project, Hanover incurred costs of over $410,000, including

13  payments to subcontractors, suppliers, and laborers.  *Id.* at ¶ 11.  At the time of its performance, the

14  City of Livermore (the "City") was holding $187,956 to pay Legg for its work on the Livermore

15  Project.  *Id.*

---

18  [1]  "[A] court may take judicial notice of 'matters of public record,'" *Lee v. City of Los Angeles*,
19  250 F.3d 668, 689 (9th Cir. 2001) (citing *Mack v. S. Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir.
    1986)), and the court need not accept as true allegations that contradict facts that are judicially noticed.
    *See Mullis v. United States Bankruptcy Ct.*, 828 F.2d 1385, 1388 (9th Cir. 1987).  The court grants the
20  Bank's unopposed request for judicial notice of Exhibit A (Complaint in *Fremont Bank v. Legg, Inc.,
    et al.*, Superior Court of California, County of Alameda, Case No. RG13679527); Exhibit B (complaint
21  in *J.F. Shea Construction, Inc. v. Legg, Inc.*, Superior Court of California, County of Alameda, Case No.
    RG1366817); Exhibit C (complaint in *ABSL Construction v. Legg, Inc.*, Superior Court of California,
22  County of Alameda, Case No. RG13676064); Exhibit F (Case management order filed October 4, 2013);
    Exhibit G (Right to Attach Order and order for Issuance of Writ dated July 16, 2013); Exhibit H (Writ
23  of Attachment dated July 9, 2013); Exhibit I (Memorandum of Garnishee dated July 26, 2013); Exhibit
    K (Notice of Entry of Judgment dated October 22, 2013); Exhibit L (Writ of Execution dated November
24  7, 2013); Exhibit M (UCC Financing Statements); and Hanover's unopposed Request for Judicial Notice
    ["HRJN," Docket No. 27] Exhibit 1 (order from *J.F. Shea* lawsuit); Exhibit 2 (order from *Ransome
25  Company v. Legg, Inc.*, Case No. HG1366719; and Exhibit 3 (order from *ABSL* lawsuit) because they
    are true and correct copies of official public records of the California Secretary of State or the Superior
26  Court of California, County of Alameda.  The authenticity of each of these documents is capable of
    accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.
27  *See* Fed. R. Evid. 201(b).

28  [2]  The court refers to these as the "Livermore Project" and the "SDCC Project," respectively, and
    collectively as the "Bonded Projects."

United States District Court

For the Northern District of California

To complete the SDCC Project, Hanover incurred costs of $107,515, including payments to subcontractors, suppliers, and laborers. *Id.* at ¶ 13. Burke is holding $104,060 under Legg's contract with Burke for the SDCC Project. *Id.*

**C. Communications From the Bank and Hanover Regarding Payment**

Both Hanover and the Bank attempted to collect on Legg's debts by demanding payment directly from the City and Burke.

Prior to May 8, 2013,[3] Hanover demanded that the City and Burke pay unused contract funds to Hanover. Alternatively, in the event that the City and Burke refused to pay, Hanover instructed the City and Burke not to pay the funds *to anyone* without Hanover's prior consent so that Hanover and the Bank could resolve their competing claims to the fund. *Id.* at ¶¶ 16-17.

On May 8, 2013, the Bank sent letters[4] to the City and to Burke stating that Legg had defaulted on its obligations to the Bank. *Id.* at ¶ 18. The letters asserted that the Bank "is the secured creditor of the above Debtor [Legg] as to its accounts receivable." *Id.* The letters also stated that "[n]o other creditor has any rights superior to Bank as to your obligation to the Debtor." *Id.* (emphasis omitted). "Bank is now entitled to collect all outstanding accounts receivable . . . ." *Id.* The Bank also claimed that it "has the superior right to payment of all sums due and payable to the Debtor," and informed the City and Burke that "[y]ou may not direct payment to anyone other than Bank regardless of any correspondence to the contrary." *Id.* (emphasis omitted). "Furthermore, if your company fails to pay Bank the sums due and pays the sums to any other person or entity, Bank will . . . take any and all action necessary to collect the sums due, including filing a lawsuit if appropriate." *Id.*

Beginning on May 21, 2013, and on multiple occasions thereafter, Hanover notified the Bank of Hanover's priority right to be paid the remaining contract funds on the Bonded Projects and requested that the Bank withdraw its payment demands, but Bank refused. *Id.* at ¶ 19.

---

[3] The Amended Complaint does not specify the date on which Hanover made these demands on the City and Burke, but the sequencing in the Amended Complaint suggests that these demands were made around the time of or prior to the Bank's demands on the City and Burke.

[4] The court refers to these letters as the "May 8 Letters."

**United States District Court**
For the Northern District of California

**D.  Lawsuits in State Court**

On May 14, 2013, the Bank filed a complaint in state court against Legg and the guarantors of Legg's obligations, alleging that Legg had breached its obligations under the loans from the Bank.[5]  *See* FRJN Ex. A (complaint in *Fremont Bank v. Legg, Inc., et al.*, Superior Court of California, County of Alameda, Case No. RG13679527).  At the time the Bank sued Legg, there were three other lawsuits pending in the same court filed by unpaid subcontractors against Legg and its sureties, including Hanover.[6]  The complaints in *J.F. Shea* and *ABSL* essentially seek payment from Legg and its sureties for work performed by and equipment provided by Legg's subcontractors. RFJN Exs. B, C.  Neither party attached the complaint in *Ransome*.

On May 24, 2013, the Bank's case was related to the *J.F. Shea* and *ABSL* cases.  FRJN Ex. E.  On October 4, 2013, the Superior Court consolidated these three cases.  FRJN Ex. F.  By then, Hanover had been dismissed with prejudice from all three suits in which it had been named a party. *See* HRJN Ex. 1 (Hanover dismissed from the *J.F Shea* lawsuit on April 26, 2013), Ex. 2 (Hanover dismissed from the *Ransome* lawsuit on May 17, 2013), Ex. 3 (Hanover dismissed from the *ABSL* lawsuit on August 6, 2013).

On July 16, 2013, the Superior Court granted the Bank's motion for a right to attach and an order for the issuance of a writ of attachment against Legg.  FRJN Ex. G.  On July 9, 2013, the Court issued a writ of attachment directing the Sheriff of Alameda County to serve the writ as levying officer.  FRJN Ex. H.  Apparently, the writ of attachment was served by the Alameda County Sheriff on the City, because on July 26, 2013, the City served and filed a Memorandum of Garnishee with the levying officer indicating that it held funds subject to the writ of attachment and was transmitting to the Sheriff the sum of $140,168.24 pursuant to the writ of attachment, and withholding $47,787.44 for payment of a stop notice.  FRJN Ex. I.

---

[5]  Those guarantors are Robert P. Legg; Leonard D'Orazio as an individual and as trustee of the D'Orazio Family Trust; and Christine D'Orazio as trustee of the D'Orazio Family Trust.

[6]  *See* FRJN Ex. B (complaint in *J.F. Shea Construction, Inc. v. Legg, Inc.*, Superior Court of California, County of Alameda, Case No. RG1366817); Ex. C (complaint in *ABSL Construction v. Legg, Inc.*, Superior Court of California, County of Alameda, Case No. RG13676064); HRJN Ex. 1 (order in *Ransome Company v. Legg, Inc.*, Case No. HG1366719).

United States District Court
For the Northern District of California

Legg did not appear in the state court action between it and the Bank, and default was entered against Legg.  Following a prove-up hearing, judgment was entered against Legg and in favor of the Bank on October 22, 2013 in the amount of $1,296,678.76.  FRJN Ex. K.  On November 7, 2013, the Alameda County Superior Court issued its writ of execution on the judgment in favor of Fremont Bank, directing the Sheriff of Alameda County to execute on the writ.  FRJN Ex. L.  Pursuant to the writ of execution, the Sheriff transferred to counsel for Fremont Bank the amount of $140,156.24, which it held pursuant to the previously levied writ of attachment.  Shiber Decl. [Docket No. 17] at ¶ 18, Ex. 1.

**E. Allegations Related to Diversity Jurisdiction**

Plaintiff alleges that this court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), because there is diversity of citizenship between the parties[7] and the amount in controversy exceeds the minimum jurisdictional amount.

**F.  Causes of Action**

Hanover brings four causes of action for (1) declaratory judgment that Hanover's right to recover any remaining contract funds on the Bonded Projects is superior to the right that the Bank may have to the funds; (2) conversion, based on the Bank's procurement of the $140,156 in contract funds that should have been paid to Hanover; (3) intentional interference with contractual relations, based on the Bank inducing and accepting payment from the City of the $140,156 in contract funds that the City was contractually obligated to pay to Hanover; and (4) money had and received, because the Bank has received $140,156 in contract funds on the Livermore Project belonging to Hanover.

The only claim that relates to the SDCC Project is the one for declaratory judgment.  The Bank avers that funds held by Burke for the SDCC Project have not been the subject of any state court action, and that the Bank has not made any effort to attach or levy such funds.  Shiber Decl. [Docket No. 17] at ¶ 19.  Furthermore, "if this action is dismissed by this Court, Fremont Bank will

---

[7]  Hanover is a New Hampshire corporation with its principal place of business in Worcester, Massachusetts. Am. Compl. at ¶ 1.  The Bank is a California state-chartered bank with its principal place of business in Fremont, California. *Id.* at ¶ 2.

United States District Court

For the Northern District of California

1    disclaim any right, interest, or claim in and to said funds . . . [but] [i]f the action is not dismissed,

2    Fremont Bank reserves all such rights, interests, and claims." *Id.*

3    **G.  Motion to Dismiss**

4         In the instant motion, the Bank first argues that the Amended Complaint should be dismissed

5    because it is a SLAPP action.[8]  *See* Cal. Code Civ. Proc. § 425.16.  In the alternative, the Bank

6    argues that the court should decline to exercise jurisdiction over Hanover's claims because of

7    prudential considerations.  While the Bank styles its motion as a "motion to dismiss," neither of

8    these two theories for dismissal fits within the typical confines of a motion to dismiss for failure to

9    state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  The court considers each

10   argument (and the governing legal standards) in turn.

## II.  ANTI-SLAPP MOTION TO STRIKE

12        The court construes the Bank's "motion to dismiss based on the anti-SLAPP statute" as a

13   special motion to strike brought under California's anti-SLAPP statute, Cal. Code Civ. Proc. §

14   425.16.[9]

15   **A.  Anti-SLAPP Statutory Scheme**

16        "The Legislature enacted Section 425.16 to prevent and deter 'lawsuits brought primarily to

17   chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress

18   of grievances.'"  *Flatley*, 39 Cal. 4th at 312 (quoting Cal. Code Civ. Proc. § 425.16(a)).  "Because

19   these meritless lawsuits seek to deplete the defendant's energy and drain his or her resources, the

---

[8]  "SLAPP is an acronym for 'strategic lawsuit against public participation.'"  *Flatley v. Mauro*, 39 Cal. 4th 299, 305 (2006).

[9]  Hanover urges this court to decline to apply the anti-SLAPP statute or certify for immediate appeal the issue of whether the anti-SLAPP statute is available to litigants in federal court.  The court declines to do so.  While a concurrence by Judges Kozinski and Paez in a recent Ninth Circuit case calls for the reconsideration of the availability of the anti-SLAPP procedures in federal courts sitting in diversity jurisdiction and applying California substantive law, *see Makaeff v. Trump University, LLC*, 715 F.3d. 254, 272-76 (9th Cir. 2013) (Kozinski, C.J. and Paez, J., concurring), it acknowledges that the current law in the Ninth Circuit is that the anti-SLAPP statute may be applied in federal diversity suits.  *Id.* at 272 ("I join Judge Wardlaw's fine opinion because it faithfully applies our law, as announced in *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 973 (9th Cir.1999), and its progeny. But I believe *Newsham* is wrong and should be reconsidered.").  Until the Ninth Circuit revisits the issue, principles of *stare decisis* require this court to apply the anti-SLAPP law.

1   Legislature sought to prevent SLAPPs by ending them early and without great cost to the SLAPP

2   target." *Id.* (citations omitted). "Section 425.16 therefore establishes a procedure where the trial

3   court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage

4   of the litigation." *Id.*  This procedure is established in Section 425.16(b)(1), which states: "A cause

5   of action against a person arising from any act of that person in furtherance of the person's right of

6   petition or free speech under the United States or California Constitution in connection with a public

7   issue[10] shall be subject to a special motion to strike, unless the court determines that the plaintiff has

8   established that there is a probability that the plaintiff will prevail on the claim."  Cal. Code Civ.

9   Proc. § 425.16(b)(1).

10         In considering an anti-SLAPP motion, a court generally is required to engage in a two-step

11  process. *Equilon Enterprises v. Consumer Cause, Inc.*, 29 Cal. 4th 53, 67 (2002). "First, the court

12  decides whether the defendant has made a threshold showing that the challenged cause of action is

13  one arising from protected activity."  *Id.*  Second, "[i]f the court finds such a showing has been

14  made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the

15  claim."  *Id.*

16  **B.  Whether the Claims "Arise From" Protected Activity**

17         At the first step of the anti-SLAPP analysis, the moving defendant bears the burden of

18  showing that the challenged cause of action is one arising from protected activity, i.e., is "an act of

19  _____

20         [10]      An "act in furtherance of a person's right of petition or free speech under the United
21  States or California Constitution in connection with a public issue" includes the following:

22         (1) any written or oral statement or writing made before a legislative, executive, or judicial
       proceeding, or any other official proceeding authorized by law,

23         (2) any written or oral statement or writing made in connection with an issue under consideration
24  or review by a legislative, executive, or judicial body, or any other official proceeding
       authorized by law,

25         (3) any written or oral statement or writing made in a place open to the public or a public forum
26  in connection with an issue of public interest, or

27         (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the
       constitutional right of free speech in connection with a public issue or an issue of public interest.

28  Cal. Code Civ. Proc.§ 425.16(e).

United States District Court

For the Northern District of California

1   that person in furtherance of the person's right of petition or free speech under the United States or

2   California Constitution in connection with a public issue." *Equilon*, 29 Cal. 4th at 67 (quoting Cal.

3   Code Civ. Proc § 425.16(b)(1)).  To determine whether the "arising from" prong is met, a court

4   considers "the pleadings, and supporting and opposing affidavits stating the facts upon which the

5   liability or defense is based."  Cal. Code Civ. Proc. § 425.16(b)(2).

6       "The 'arising from' requirement is not always easily met."  *Freeman v. Schack*, 154 Cal.

7   App. 4th 719, 730 (2007).  "[T]he critical point is whether the plaintiff's cause of action itself was

8   *based on* an act in furtherance of the defendant's right of petition or free speech."  *City of Cotati v.*

9   *Cashman*, 29 Cal. 4th 69, 78 (2002) (emphasis in original).  The court therefore looks to the

10  "*principal thrust* or *gravamen* of the plaintiff's cause of action [to] determine[] whether the anti-

11  SLAPP statute applies."  *Freeman*, 154 Cal. App. 4th at 727 (emphasis in original).  On the one

12  hand, "[i]t is well-established that a plaintiff will not avoid the application of the anti-SLAPP statute

13  by disguising the pleading as a 'garden variety' tort claim if the basis of the alleged liability is

14  predicated on protected speech or conduct.  Thus, a plaintiff cannot frustrate the purposes of the

15  SLAPP statute through a pleading tactic of combining allegations of protected and nonprotected

16  activity under the label of one 'cause of action.'"  *Wang v. Wal-Mart Real Estate Bus. Trust*, 153

17  Cal. App. 4th 790, 801-02 (2007) (citations omitted).  On the other hand, "[t]he mere fact that a

18  plaintiff has filed an action after a defendant has engaged in some protected activity does not mean

19  that the plaintiff's action *arose* from that activity."  *Gallimore v. State Farm Fire & Cas. Ins. Co.*,

20  102 Cal. App. 4th 1388, 1398 (2002).  *See also Freeman*, 154 Cal. App. 4th at 729-30 ("A cause of

21  action may be 'triggered by' or associated with a protected act, but it does not necessarily mean the

22  cause of action *arises* from that act.").  "[W]hen the allegations referring to arguably protected

23  activity are only incidental to a cause of action based essentially on nonprotected activity, collateral

24  allusions to protected activity should not subject the cause of action to the anti-SLAPP statute."

25  *Freeman*, 154 Cal. App. 4th at 727.

26      It is true that filing a lawsuit and related pre-litigation conduct may constitute "protected

27  activity" in the context of the anti-SLAPP statute.  *See, e.g.*, *Briggs v. Eden Council for Hope &*

28  *Opportunity*, 19 Cal. 4th 1106 (1999) (granting anti-SLAPP motion against landlords who brought

**United States District Court**
For the Northern District of California

defamation and emotional distress claims against housing organization based on statements made by organization in assisting tenants with problems that eventually led to legal action against the landlords, because claims "arose from" protected activity); *Equilon*, 29 Cal. 4th at 53 (filing pre-lawsuit notice of intent to sue may be protected activity).   However, simply because the Bank is involved in a lawsuit against Legg does not necessarily mean that Hanover's lawsuit "arises from" that protected activity.  Numerous courts have denied anti-SLAPP motions where the plaintiff's lawsuit was "triggered by" the defendant's litigation-related activities in a different action but did not "arise from" those activities.

For example, in *California Back Specialists Med. Grp. v. Rand*, the court denied an anti-SLAPP motion brought by an attorney who had been sued by a medical provider for, among other things, conversion and money had and received.  160 Cal. App. 4th 1032 (2008).  The medical provider claimed that the attorney had disbursed his clients' personal injury lawsuit proceeds without satisfying liens that the medical provider held on those proceeds, despite having signed the liens himself and agreeing to satisfy them.  The attorney argued that the claims arose from protected activity, i.e., the actions he took while representing his clients in a lawsuit.  The court disagreed, finding that the "complaint is based on the underlying controversy between private parties about the validity and satisfaction of the liens. These issues were never under consideration in any court or official proceedings until [the medical provider] filed the current action."  *Id.* at 1037.  Thus, the claims did not arise from protected activity, and the attorney failed to meet his burden at the first step of the anti-SLAPP analysis.

In *Kajima Eng'g & Const., Inc. v. City of Los Angeles*, 95 Cal. App. 4th 921 (2002), a contractor brought a breach of contract action against the city for failing to pay the contractor for construction projects.  The city cross-claimed for breach of contract and fraud.  The contractor contended that the cross-claims should be dismissed as SLAPPs because they operated to discourage the contractor from pursuing its lawsuit to obtain contract damages.  The court denied the anti-SLAPP motion, finding that "the alleged improper conduct does not arise from [the contractor's] petitioning activities but rather from its bidding and contracting practices."  *Id.* at 930.  The court noted that the cross-claims were based on allegations that the contractor had "intentionally underbid

**United States District Court**
For the Northern District of California

the project knowing it could not complete the work within the price submitted and later claimed additional compensation based on false and/or inflated progress payment requests." *Id.* at 929. These acts were deemed not to constitute "acts that were made in furtherance of the right of petition or free speech" within the meaning of the anti-SLAPP statute. *Id.* at p. 932.

In *Freeman*, 154 Cal. App. 4th at 729-32, the court held that contract and tort claims against an attorney for representing adverse interests in a litigation are not subject to an anti-SLAPP motion because they did not "arise from" the attorney's protected activity. "There is no doubt plaintiffs' causes of action have as a major focus [the attorney's] actions in representing" the adverse client, filing an action on his behalf, and settling that action. *Id.* at 729. "However, the fact [that] plaintiffs' claims are related to or associated with [the attorney's] litigation activities is not enough . . . [T]he principal thrust of the conduct underlying [the plaintiffs'] causes of action is not [the attorney's] filing or settlement of litigation[, it] is his undertaking to represent a party with interests adverse to plaintiffs, in violation of the duty of loyalty he assertedly owed them." *Id.* at 729-30, 732.

Here, the Bank claims that the "Amended Complaint is based squarely on Fremont Bank's pre-litigation demand, prosecution of the State Court Action, orders issued in the State Court Action, and Fremont Bank's post-judgment efforts to enforce the State Court's orders." Motion at 6. The Bank notes that the Amended Complaint references the Bank's May 2013 letter to the City, the state court lawsuit filed by the Bank against Legg, the writ of attachment, and the service of the writ on the City. However, these facts alone do not answer the question of whether Hanover's claims "arise from" underlying protected activity. To do so, the court must examine the gravamen of each of Hanover's claims.

**1. Declaratory Judgment Claim**

The declaratory judgment claim makes no reference to the state court action or any actions taken by the Bank in furtherance of that action. Instead, it alleges that "[a]n actual controversy has arisen and now exists between Hanover and the Bank as to which of them has the superior right to recover the remaining contract funds on the Bonded Projects," and requests a judicial declaration resolving the issue. Am. Compl. at ¶¶ 21, 24. The principal thrust of this claim is not the Bank's filing of the state court litigation or its efforts to collect on that judgment, but rather the unanswered

United States District Court

For the Northern District of California

legal question of which party holds priority rights to contract funds payable to Legg. This issue was never under consideration in any court until Hanover filed the current action.[11] The declaratory judgment claim thus does not arise from protected conduct by the Bank. The anti-SLAPP motion is **denied** with respect to this claim.[12]

### 2. Money Had and Received Claim

The money had and received claim states simply that "[t]he Bank has received $140,156 in contract funds on the Livermore Project belonging to Hanover. Equity and good conscience dictate that the Bank pay over to Hanover the funds." Am. Compl. at ¶¶ 40-41. "A cause of action for money had and received is stated if it is alleged that the defendant is indebted to the plaintiff in a certain sum for money had and received by the defendant for the use of the plaintiff." *Avidor v. Sutter's Place, Inc.*, 212 Cal. App. 4th 1439, 1454 (2013). "It may be brought wherever one person has received money which belongs to another, and which in equity and good conscience, or in other words, in justice and right, should be returned." *Mains v. City Title Ins. Co.*, 34 Cal. 2d 580, 586 (1949) (citations omitted). Thus, a claim for money had and received does not focus on the means by which the defendant acquired the money. Although the event that catalyzed the Bank's possession of the contract funds was its collection on the state court judgment, the gravamen of this claim is not *how* the Bank received those contract funds but *to whom* the contract funds belong, a question that no court has thus far considered. Because reference to the protected activity is only incidental to the principal thrust of the money had and received claim, the claim does not "arise

---

[11] At the hearing, counsel for the Bank conceded that no court, including the court in the state court action, has been faced with or has resolved this question.

[12] The Bank argues that *Brown v. Kennard*, 94 Cal. App. 4th 45 (2001) and *Rusheen v. Cohen*, 37 Cal. 4th 1048 (2006) support the position that actions taken to collect a judgment are protected activity in the anti-SLAPP context. The *Rusheen* court held that "actions taken to collect a judgment, such as obtaining a writ of execution and levying on a judgment debtor's property" are protected activity subject to an anti-SLAPP motion, where the cause of action is based those actions. *Id.* at 1052. But *Brown* and *Rusheen* are dissimilar to the circumstances here because, in those cases, the plaintiff brought claims against lawyers who were attempting to collect on judgments for their clients. *See Brown*, 94 Cal. App. 4th at 49-50 (individual sued lawyer for abuse of process, for levying the individual's deposit account pursuant to a writ of execution); *Rusheen*, 37 Cal. 4th at 1052 (individual sued lawyer for abuse of process based on lawyer's actions in securing and executing default judgment against individual). The claims in *Brown* and *Rusheen* thus directly "arose from" the collection activities. Here, as explained above, Hanover does not attack the act of collection but simply requests adjudication on the issue of priority right to funds owed to Legg.

United States District Court

For the Northern District of California

from" that activity.  The anti-SLAPP motion is **denied** with respect to the money had and received claim.

### 3. Conversion Claim

Hanover's conversion claim alleges that "the Bank intended to exercise and in fact did exercise dominion and control over property belonging to Hanover, namely Livermore Project contract funds in the amount of $140,156."  Am. Compl. at ¶ 28.  "Conversion is the wrongful exercise of dominion over the property of another."  *Burlesci v. Petersen*, 68 Cal. App. 4th 1062, 1066 (1998).  "The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages."  *Id.*  The "wrongful act" underpinning the conversion may be a simple refusal to surrender possession or an "unjustified refusal to deliver possession."  *Messerall v. Fulwider*, 199 Cal. App. 3d 1324, 1332 (1988).  *See also Briggs v. Haycock*, 63 Cal. 343, 345 (1883) (refusal to surrender property undisputedly owned by plaintiff amounted to conversion); *Beckman v. McKay*, 14 Cal. 250, 251 (1859) ("A conversion may arise either by a wrongful taking, or by an illegal assumption of ownership of the chattel, or by an unlawful application of it, or a wrongful detention . . . So a conversion is presumed whenever a willful detention or continuance of possession after demand legally made has been proven.").  Hanover's allegations do refer to the Bank's state court lawsuit against Legg and its actions to collect on that judgment, but these simply explain how the Bank came into possession of Hanover's alleged property.  Again, the principal thrust of this claim is the unresolved question of the ownership of the property, not the means by which one party came into possession of that property.  The conversion claim does not arise under the Bank's protected activity.  The anti-SLAPP motion is **denied** with respect to the conversion claim.

### 4. Intentional Interference With Contractual Relations Claim

"The elements which a plaintiff must plead to state the cause of action for intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual

United States District Court

For the Northern District of California

1  relationship; and (5) resulting damage." *Halvorsen v. Aramark Unif. Servs., Inc.*, 65 Cal.App.4th

2  1383, 1391 (1998).

3         Hanover's intentional interference with contractual relationship claim addresses a somewhat

4  different matter than the other claims.  Hanover alleges that the "contractual relationship" at issue

5  was the City's "implied duty under the [surety] bonds to maintain contract funds for Hanover's

6  benefit in the event that Hanover was required to perform under the bonds."  Am. Compl. at ¶ 32.

7  The Bank interfered with this contractual relationship "by inducing and accepting payment from the

8  City of $140,156 in contract funds that should have been paid to Hanover."  *Id.* at ¶ 33.  In its

9  opposition to this motion and at the hearing, Hanover clarified that it does not contend that the

10  Bank's lawsuit against Legg or its post-judgment collection activities formed the "intentional acts"

11  required to state this claim.  Instead, Hanover contends that "[t]he Bank interfered with the

12  contractual relationship between Hanover and the City . . . when it sent out and refused to withdraw

13  the May 8 Letters."  Opp. [Docket No. 24] at 11. In response, the Bank argues that this claim arises

14  from protected activity.

15                     **a.  Normal Course of Business**

16         Hanover's first argument is that the May 8 Letters were not protected activity because they

17  "were not sent out in connection with any judicial or other official proceeding or otherwise in

18  furtherance of the Bank's right of free speech or petition.  Rather, they were sent out as part of the

19  Bank's standard operating procedures as a private business."  Opp. at 11.

20         However, the only case Hanover cites for its argument that "activities carried out in the

21  normal course of business do not constitute protected activities even if tangentially related to an

22  official proceeding" is inapposite.  In *Wang*, 153 Cal. App. 4th at 804, 808-10, landowners alleged

23  that Wal-Mart and a traffic consultant falsely represented or concealed facts about plans for and

24  traffic flow around a new store, which ultimately blocked street access to landowners' property.  The

25  court denied Wal-Mart's anti-SLAPP motion and held that the landowners' breach of contract,

26  fiduciary duty, and fraud claims did not "arise from" a protected activity even though the alleged

27  representations were made during the governmental planning and permitting process.  *Wang* does

28  not stand for the general proposition that activities carried out in the normal course of business

United States District Court

For the Northern District of California

1   cannot be considered protected activity for purposes of the anti-SLAPP statute.  Indeed, such a

2   proposition would contravene the statutory language that defines protected activity to include "any

3   written or oral statement or writing made before [or in connection with an issue under consideration

4   by] a legislative, executive, or judicial proceeding, or any other official proceeding authorized by

5   law" and "any . . . conduct in furtherance of the exercise of the constitutional right of petition"

6   regardless of whether such conduct was carried out in the normal course of business.  Cal. Code Civ.

7   Proc. § 425.16(e)(1)-(2), (4).   Thus, simply because the May 8 Letters may have been sent in the

8   Bank's normal course of business does not mean that they cannot be considered protected activity.

9                    **b.  Statements Made "In Connection With" Judicial Proceedings**

10       Hanover also argues that the sending of the May 8 Letters is not protected activity because it

11   was a pre-litigation communication not made "in connection with" litigation.  Under the anti-SLAPP

12   statute, protected activity includes "any written or oral statement or writing made in connection with

13   an issue under consideration or review by a legislative, executive, or judicial body, or any other

14   official proceeding authorized by law."  Cal. Code Civ. Proc.§ 425.16(e)(2).  "[A] statement is 'in

15   connection with' litigation under section 425.16, subdivision (e)(2) if it relates to the substantive

16   issues in the litigation and is directed to persons having some interest in the litigation."  *Neville v.*

17   *Chudacoff*, 160 Cal. App. 4th 1255, 1266 (2008).

18       The May 8 Letters communicated two distinct messages.  The first message was that Legg

19   had defaulted on debts Legg owed to the Bank, such that the Bank could be entitled to some of the

20   funds that the City owed to Legg.  Hanover concedes that these statements may be protected activity

21   because they directly concern the subject matter of the Bank's state court breach of contract

22   litigation against Legg, which was filed six days after the May 8 Letters,[13] and which resulted in,

23   among other things, the Bank seeking a writ of attachment and serving it on the City.  Accordingly,

24   Hanover's intentional interference claim is based only upon the second message communicated in

25

26       [13]  *See* Hanover Supp. Brief [Docket No. 36] at 1 (the statement that Legg "has defaulted on its
27   obligations due to Bank" "could be deemed to be 'in connection with' an issue under consideration or
     review by the state court in the Bank's lawsuit against Legg and its guarantors") and 5 ("Hanover . . .
28   is suing the Bank for damages resulting from the ***other*** statements in the May 8 Letters.") (emphasis
     added).

United States District Court

For the Northern District of California

the May 8 Letters, i.e., the Bank's assertion that it had rights *superior* to any other of Legg's creditors, such that *all* outstanding funds should be directed to the Bank.[14]  Hanover raises two arguments for why these statements do not constitute protected activity: (1) they "had nothing to do with the substantive issues in the Bank's breach of contract lawsuit against Legg and its guarantors"; and (2) the Bank sent these letters to individuals who "were not potential witnesses or unwitting participants in Legg's default under its loan agreements with the Bank" but rather to "persons who may have owed money to Legg, with no connection to the Bank's loans to Legg." *Id.* at 5.

The parties agree that fact that the May 8 Letters were sent *prior* to any lawsuit is not dispositive, because a communication can still be made "in connection with" a lawsuit even if it is made before the lawsuit is filed.  Courts have thus extended anti-SLAPP protection to pre-litigation letters.  *See, e.g.*, *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman*, 47 Cal. App. 4th 777, 784 (1996) ("Just as communications preparatory to or in anticipation of the bringing of an action or other official proceeding are within the protection of the litigation privilege of Civil Code [§ 47(b)][15], we hold that such statements are equally entitled to the benefits of section 425.16.") (citations omitted). In *Neville*, for example, an employer (MaxSecurity) sued a former employee (Neville) for breach of contract and misappropriation of trade secrets.  *Neville*, 160 Cal. App. 4th at 1259.  Four months before the lawsuit, the employer's attorney sent a letter to the employer's customers that accused Neville of breach of contract and misappropriation of trade secrets, and that "suggest[ed]" to the customers that, to avoid potential involvement in any ensuing litigation "as a material witness, or otherwise," the customers should not do business with the former employee.  *Id.*  The court found

---

[14]   *See* Am. Compl. at ¶ 18 (May 8 Letters stated that "No other creditor has any rights superior to Bank as to your obligation to the Debtor . . . . Bank is now entitled to collect *all* outstanding accounts receivable . . . . You may not direct payment to *anyone other than Bank* regardless of any correspondence to the contrary.") (emphasis added).

[15]   The court may turn to California jurisprudence on conduct protected by the so-called "litigation privilege" as an aid in determining whether conduct may constitute "protected activity" for purposes of the anti-SLAPP statute.  *See Flatley*, 39 Cal. 4th at 322-23.
The litigation privilege protects publications and communications made during the initiation or course of any legislative or judicial proceeding or any other proceeding authorized by law.  Cal. Civ. Code § 47(b).  "The privilege is not limited to statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or afterwards."  *Rusheen, supra* n. 12, 37 Cal. 4th at 1057. "[A] complaint [need not] be drafted before the privilege will apply."  *Aronson v. Kinsella*, 58 Cal. App. 4th 254, 268 (1997).

1  that the letter was a "writing made in connection with an issue under consideration or review by a

2  judicial body" and therefore protected activity, and then granted the employer's anti-SLAPP motion

3  against Neville's defamation claim based on the letter.  *Id.*

4         Hanover's argument is that the substance of the May 8 Letters is not closely enough related

5  to the substantive issues in the Bank's state court lawsuit to be made "in connection with" an issue

6  under review in that lawsuit.  Hanover cites cases in which courts protect communications where

7  they address specific issues under review in a lawsuit.  For example, in *Neville*, the court noted how

8  closely connected the substance of the letter was to ultimate issues in the employer's subsequent

9  lawsuit:

> 10    The Letter related directly to MaxSecurity's claims for breach of contract and
>        misappropriation of trade secrets against Neville.  Neville was alleged to have
> 11    misappropriated Maxsecurity's customer lists. The Letter was directed to Maxsecurity's
>        current and former customers—persons whom Maxsecurity reasonably could believe had an
> 12    interest in the dispute as potential witnesses to, or unwitting participants in, Neville's alleged
>        misconduct . . . . [T]he Letter contained no statements of fact concerning Neville that were
> 13    not based on or related to the allegations that formed the basis of Maxsecurity's claims.
>        Thus, the Letter was "in connection with" the issues in Maxsecurity's lawsuit against Neville.

14

15 *Id.* at 1267-68.

16         Inversely, in *McConnell v. Innovative Artists Talent & Literary Agency, Inc.*, 175 Cal. App.

17 4th 169 (2009), the court found that communications were *not* protected activity when they were not

18 sufficiently related to the issues under consideration in the lawsuit.  In *McConnell*, two talent agents

19 (McConnell and Press) sued their employer (Innovative) to invalidate provisions of their

20 employment contracts that prohibited them from leaving their jobs without cause. The next day, the

21 employer sent each agent a letter describing changes in the agents' job duties, and new restrictions

22 on using company email and offices and contacting clients.  The agents believed the letters

23 constituted constructive termination, and added retaliation and wrongful termination claims to their

24 suits.  The employer brought an anti-SLAPP motion against the retaliation and wrongful termination

25 claims.  The *McConnell* court denied the employer's anti-SLAPP motion, concluding that the

26 employer had not made threshold showing that the letters were "in connection with" the agents'

27 lawsuits:

28

United States District Court

For the Northern District of California

> [T]he existence of the McConnell/Press lawsuits does not mean that any writing Innovative might send thereafter is a "writing made in connection with an issue under consideration or review" in the lawsuits . . . . It is insufficient to assert that the acts alleged were "in connection with" an official proceeding. There must be a connection with an issue under review in that proceeding.
>
> Here, the lawsuits McConnell and Press filed on August 27, 2007, sought declaratory and injunctive relief establishing that McConnell and Press were legally free to leave Innovative whenever they chose. While the lawsuits undoubtedly precipitated Innovative's conduct the following day, that conduct . . . was obviously directed at preventing McConnell from taking clients with him when he left, not at establishing that McConnell was legally required to stay. Indeed, the Harris letter on its face says nothing at all about McConnell's lawsuit, and nothing at all about any claims Innovative might make in that lawsuit. Consequently, it is difficult to find any basis to conclude that Innovative's letter was written "in connection with an issue under consideration" in those lawsuits, of which no mention at all was made.

*Id.* at 177-78. The *McConnell* court also rejected the employer's argument that the letters merely reflected the employer's investigation into the agents' employment contract claims: "[T]he letters do not mention the lawsuits; do not mention any desire to investigate; do not refer to any misconduct by McConnell and Press; and do not mention 'pending or prospective claims' or their 'potential resolution.' In short, the McConnell/Press causes of action for retaliation and wrongful termination could not have been based on protected litigation activity, in the form of Innovative's investigation of pending claims, when no such investigative activity is reflected in [the] letter." *Id.* at 178.

In *Paul v. Friedman*, 95 Cal. App. 4th 853 (2002), an attorney represented the former clients of a securities broker in an arbitration based on the broker's alleged securities fraud. The arbitration resulted in "complete vindication for [the broker]" and sanctions against the attorney for filing a frivolous claim intended to harass the broker. *Id.* at 857. The broker then sued the attorney, arguing that attorney had conducted an intrusive investigation before and during the arbitration into the securities broker's personal life and had disclosed to the broker's clients and others personal details—including details about the broker's financial affairs, spending habits, tax liabilities, and close personal relationship with another individual—that had no bearing on the alleged securities fraud at issue in the arbitration. *Id.* The attorney brought an anti-SLAPP motion, arguing that his conduct was protected because it was undertaken "in connection with" the arbitration proceeding. The Court of Appeal found that attorney had failed to satisfy his threshold burden to show the activity was protected. It held that "[Section 425.16] does not accord anti-SLAPP protection to suits arising from any act having any connection, however remote, with an official proceeding. The

statements or writings in question must occur in connection with 'an issue under consideration or review' in the proceeding." *Id.* at 866.  In *Paul*, "the intrusive prehearing investigation of and disclosures concerning [the broker's] personal life . . . were unrelated to any issue under consideration in the arbitration . . . . A lawyer's attempt to inject an issue into a proceeding does not render the issue relevant . . . [or] transform it into an issue 'under consideration or review' in the proceeding." *Id.* at 867-68.

While the above cases suggest that the communications sought to be protected must be directly relevant to an issue under consideration in a lawsuit, the Bank cites to three cases in support of its argument that courts have found less closely related communications to be protected activity. The first is *Neville*, which, for reasons explained above, actually supports Hanover's position.  The second case is *Contemporary Services Corporation v. Staff Pro Inc.*, 152 Cal. App. 4th 1043 (2007). In that case, the plaintiff was a company that provided event staffing services.  The plaintiff and one of its competitors (Defendant Staff Pro) had "an extensive litigious history together." *Id.* at 1047-49.  While litigation was pending, the president of Staff Pro, Meredith, sent an e-mail to nine of Staff Pro's clients, at least some of which had been deposed, and all of which "had some involvement at least in the Los Angeles action." *Id.* at 1047, 1054.  The email stated, among other things, that the plaintiff had paid ex-employees of Staff Pro to "make false statements in declarations [which] . . . were then presented to Staff Pro's clients in an effort to create doubt in Staff Pro's clients' minds." *Id.* at 1050 (formatting in original).  Meredith declared that the purpose of the email was to inform clients of the status of the litigation, "to give them some idea as to how their testimony and production of documents . . . had been used, to give these persons some level of comfort that it was unlikely any further testimony would be needed from them . . . and, lastly, to apologize for any disruption to their business that occurred as a result of being 'dragged into' the [litigation] because of their connection to Staff Pro." *Id.*  The plaintiff filed another action against Staff Pro and Meredith for, among other things, defamation based on Meredith's statements in his e-mail.  The court granted an anti-SLAPP motion against the defamation claim, finding that Meredith's email "constitutes a litigation update, which describes the parties' contentions and court rulings, and is directed to individuals who had some involvement in the parties' litigation," and that Staff Pro had

1   made a threshold showing that the emails were made "in connection with an issue under

2   consideration or review by a . . . judicial body." *Id.* at 1055.

3          The third case cited by the Bank is *Healy v. Tuscany Hills Landscape & Recreation Corp.*,

4   137 Cal. App. 4th 1 (2006), in which a homeowner in a residential development denied her

5   homeowners association access across her property to abate a fire hazard caused by weed growth on

6   an adjacent piece of land.  The HOA sued the homeowner for injunctive and declaratory relief.  The

7   attorney for the association sent a letter to other residents of the development stating that (1) the

8   attorney represented the HOA in a lawsuit related to the access issue, and (2) that weed abatement

9   would cost more money because the homeowner prohibited the HOA from accessing the weeds

10  through her property.  *Id.* at 4.  The homeowner filed a cross-complaint against the HOA for

11  defamation, alleging the attorney's statement falsely communicated to other residents of the

12  development that the homeowner was responsible for causing the HOA to incur additional costs.

13  The HOA moved to strike the homeowner's cross-complaint under the anti-SLAPP statute.  The

14  Court of Appeal found that the HOA met its threshold burden of showing that its letter was

15  petitioning activity protected by both the anti-SLAPP statute and the litigation privilege.  *Id.* at 6.

16  The court noted that "[b]oth section 425.16 and Civil Code section 47 are construed broadly, to

17  protect the right of litigants to 'the utmost freedom of access to the courts without the fear of being

18  harassed subsequently by derivative tort actions." *Id.* at 5.  "Thus, it has been established for well

19  over a century that a communication is absolutely immune from any tort liability if it has 'some

20  relation' to judicial proceedings." *Id.* (citing *Rubin v. Green*, 4 Cal. 4th 1187, 1194-95 (1993)).  The

21  court found that the allegedly defamatory statements in the attorney's letter "unquestionably come

22  within the litigation privilege" because they referred to the litigation against the homeowner and

23  informed other members of litigation involving the HOA.

24         In this case, the proffered connections between the May 8 Letters and the state court

25  litigation are not as strong as the connections found in *Contemporary Services* and *Healy*.  First,

26  unlike the recipients of the email in *Contemporary Services*, who were witnesses and otherwise

27  involved in the litigation, here the City has little interest in the state court litigation.  While there is

28  no requirement in Section 425.16(e)(2) that communications are protected only if they are made to

potential witnesses or unwitting participants in the lawsuit,[16] the communication must be directed to persons having "some interest in the litigation." *Neville*, 160 Cal. App. 4th at 1266. The Bank explains that the City had "some interest in the litigation" even though it was not named as a party to the Bank's lawsuit against Legg because "the Bank's letters asserted a right to collateral held by the recipients securing repayment of the Bank's loan to Legg." Bank Supp. Brief [Docket No. 37] at 5. However, this only explains the City's interest vis-a-vis the portions of the May 8 Letters which refer to Legg's default. As discussed above, these portions do not form the basis of Hanover's claim. The Bank offers no explanation for how the City has "some interest" in the *disputed* statements in the May 8 Letters, i.e., the statements that the Bank's rights to collect are superior to any other claims on the funds, which were not the subject of the state court action.

Second, unlike in *Healy*, where the communication was sent by the HOA's attorney identifying a specific lawsuit in which the HOA and a homeowner were engaged and informing homeowners about that lawsuit, here the May 8 Letters were sent by a Bank director, and did not reference attorneys, specific litigation, or even a non-litigation dispute between the Bank and any other specific party. *Compare Neville*, 160 Cal. App. 4th at 1269 (the court granted the anti-SLAPP motion where "[t]he evidence before the trial court in this case established a threat of impending litigation," where the pre-litigation letter's reference line read "Maxsecurity v. Mark Neville, dba ABD Audio and Video," the letter was written by an attorney on the letterhead of a law office, and the letter stated that "this office represents Maxsecurity in the above-matter [sic]" and "We have notified Mr. Neville of his breach and shall be aggressively pursue [sic] all available remedies," and Maxsecurity filed suit four months later).

---

[16] *See Neville*, 160 Cal. App. 4th at 1270 ("We also reject Neville's argument that the Letter is not protected because it was addressed to Maxsecurity's customers, against whom Maxsecurity had no claim, rather than to Neville. Although many anti-SLAPP cases involving prelitigation communications concern demand letters or other statements to adverse parties or potential adverse parties, there is no such requirement in the text of section 425.16, subdivision (e)(2). That provision has been held to protect statements to persons who are not parties or potential parties to litigation, provided such statements are made "in connection with" pending or anticipated litigation.") (citations omitted). *See also Healy*, 137 Cal. App. 4th at 1 (letter from homeowners association to non-party association members was petitioning activity protected by both anti-SLAPP statute and litigation privilege).

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1    Under these circumstances, the Bank has not made a threshold showing that the May 8

2  Letters are communications made "in connection with" a litigation.  The sending of the May 8

3  Letters was therefore not "protected activity" within the meaning of the anti-SLAPP statute, and

4  Hanover's intentional interference claim does not "arise from" protected activity.  The anti-SLAPP

5  motion is **denied** with respect to the intentional interference with contractual relations claim.

### III.  PRUDENTIAL CONSIDERATIONS

7    The Bank argues in the alternative that the court should dismiss the case for lack of subject

8  matter jurisdiction based on the *Younger* abstention doctrine, the doctrine of prior exclusive

9  jurisdiction, the *Colorado River* doctrine, and the *Brillhart* doctrine.  Although the Bank invokes the

10  legal standard for a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of

11  Civil Procedure 12(b)(1), that standard is inappropriate here.  The court has subject matter

12  jurisdiction pursuant to 28 U.S.C. § 1332(a), because Hanover has plausibly alleged (and the Bank

13  does not contest) that there is diversity of citizenship between the parties and the amount in

14  controversy exceeds the minimum jurisdictional amount.  Instead, the above doctrines are prudential

15  considerations regarding a federal court's exercise of jurisdiction over cases that affect state

16  proceedings.  The factors and legal standards the court must consider when applying each of these

17  doctrines are discussed further below.

18  **A.  *Younger* Abstention Doctrine**

19    In the state court actions, the Bank obtained a default judgment against Legg on October 22,

20  2013.  Apparently, the state court actions between Legg's subcontractors and Legg are ongoing in

21  state court, although neither the Bank nor Hanover are parties in those actions.

22    Based on these facts, the Bank argues that the abstention doctrine developed in *Younger v.*

23  *Harris*, 401 U.S. 37, 41 (1971), requires the court to dismiss Hanover's claims.  "In *Younger v.*

24  *Harris,* the Supreme Court reaffirmed the long-standing principle that federal courts sitting in equity

25  cannot, absent exceptional circumstances, enjoin pending state criminal proceedings."  *ReadyLink*

26  *Healthcare, Inc. v. State Comp. Ins. Fund*, No. 12-56248, -- F.3d --, 2014 WL 2611166 at *2 (9th

27  Cir. June 12, 2014).  The *Younger* abstention doctrine applies in civil actions where each of the

28  following factors is present: "(1) there is an ongoing state judicial proceeding, (2) those proceedings

United States District Court

For the Northern District of California

1    implicate important state interests, and (3) there is an adequate opportunity in the state proceedings

2    to raise constitutional challenges." *Id.* The Ninth Circuit has also "identified a fourth requirement:

3    The requested relief must seek to enjoin or have the practical effect of enjoining ongoing state

4    proceedings." *ReadyLink*, -- F.3d --, 2014 WL 2611166 at *2. "If the circumstances giving rise to

5    *Younger* abstention apply, the district court must dismiss the action."[17] *Baffert v. California Horse

6    Racing Bd.*, 332 F.3d 613, 617 (9th Cir. 2003).

7        "[A] federal plaintiff has no obligation to intervene in state court litigation raising issues

8    similar to those that the plaintiff wishes to raise in federal court." *Green v. City of Tucson*, 255 F.3d

9    1086, 1102-03 (9th Cir. 2001), *overruled on other grounds*, *Gilbertson v. Albright*, 381 F.3d 965

10   (9th Cir. 2004). Thus, courts generally only apply the *Younger* doctrine where the party against

11   whom it is asserted is also a party to the state court action. *Vasquez v. Rackauckas*, 734 F.3d 1025,

12   1035 (9th Cir. 2013) ("Only under quite limited circumstances may *Younger* oust a district court of

13   jurisdiction over a case where the plaintiff is not a party to an ongoing state proceeding.") (citing

14   *Green*, 255 F.3d at 1099). The only exception to this rule comes when the interests of the party in

15   the federal court action are "so intertwined with those of the state court party that direct interference

16   with the state court proceeding is inevitable," such as when parties in both actions are owned or

17   controlled by the same entity. *Green*, 255 F.3d at 1099-1100.

18       Here, the Bank asserts that the court should apply the *Younger* doctrine in dismissing

19   Hanover's claims. However, the Bank does not explain why the *Younger* doctrine is applicable,

20   given that Hanover is not a party to the state action. The Bank does not argue that Hanover's prior

21

22       [17] "*Younger* abstention is not jurisdictional; it is a prudential limitation designed to preserve
     comity between state and federal courts." *Adibi v. California State Bd. of Pharmacy*, 461 F. Supp. 2d
23   1103, 1111 (N.D. Cal. 2006). *See Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477
     U.S. 619, 626 (1986) (stating that *Younger* abstention "does not arise from lack of jurisdiction in the
24   District Court, but from strong policies counseling against the exercise of such jurisdiction where
     particular kinds of state proceedings have already been commenced"); *United States v. Morros*, 268 F.3d
25   695, 707 (9th Cir. 2001) ("Whether it is labeled comity, federalism, or some other term, the policy
     objective behind *Younger* abstention is to avoid unnecessary conflict between state and federal
26   governments.") (internal quotation marks omitted); *Kleenwell Biohazard Waste and General Ecology
     Consultants, Inc. v. Nelson,* 48 F.3d 391, 394 n. 3 (9th Cir.1995) ("*Younger* abstention is a
27   jurisprudential rather than a jurisdictional question."). "[T]he issue of *Younger* abstention can be
     addressed by a federal court at any time no matter how far along the litigation is." *Adibi*, 461 F.Supp.2d
28   at 1109.

United States District Court
For the Northern District of California

presence in suits by Legg's subcontractors makes it a party to the state action for purposes of the *Younger* doctrine, nor that Hanover is intertwined with any of the parties in the state court action. None of the state court actions concern the Bank and Hanover's claims against each other; to the extent Hanover was ever involved, it was as a defendant in the actions initiated by Legg's subcontractors alleging claims dissimilar to those in this case. The Bank notes that "Hanover knew about the state court action and elected not to participate," but, as described above, a federal litigant is not required to intervene in a state court litigation to raise issues similar to those he wishes to raise in the federal court. Under these circumstances, the *Younger* doctrine simply does not apply.

Even setting aside this fundamental defect in the Bank's argument, *Younger* abstention is still inappropriate because the fourth requirement is not met.[18] The Bank has not explained how the declaratory relief sought by Hanover would effectively enjoin an ongoing state proceeding. The ongoing state court litigation at issue here is the action by Legg's subcontractors against Legg. The Bank's claims against Legg appear to have been resolved by the state court's entry of default judgment on October 22, 2013. Given that neither Hanover nor the Bank appear to be involved in live claims in that suit, it is unclear how the resolution of Hanover's claim against the Bank would affect that suit, much less enjoin it.

The Bank appears to assert that the "ongoing proceeding" is its effort to collect on its default judgment against Legg. A collection process may indeed be classified as an "ongoing proceeding" for purposes of the *Younger* doctrine. *See Pennzoil*, 481 U.S. at 6 (holding that *Younger* doctrine barred federal court from hearing suit by Texaco seeking to enjoin Pennzoil from taking any action to enforce state court judgment). The Bank has already collected $140,156 from the City of Livermore, funds to which Hanover asserts a right of priority in its amended complaint. The state

---

[18]   The first *Younger* factor is satisfied because a state court action is ongoing. The second *Younger* factor requires that the federal proceeding implicate important state interests. States' interests in "enforcing the orders and judgments of their courts" qualify as important for the purposes of this factor. *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 13-14 (1987). Thus, the Bank has satisfied the second *Younger* factor as well. The third *Younger* factor requires that the litigant have an adequate opportunity to raise constitutional challenges in the state proceeding is also met here because Hanover has only alleged state law claims. *See AmerisourceBergen Corp. v. Roden*, 495 F.3d 1143, 1149 n.10 (9th Cir. 2007) (third *Younger* factor was "automatically satisfied" because plaintiff plead state law breach of contract claim, raising "no federal questions whatsoever").

United States District Court

For the Northern District of California

court judgment gives the Bank the right to collect funds owed up to $1,296,679, and Hanover in its amended complaint asks the court to assert that it has the right to collect "any remaining contract funds" owed by the city on the Legg contract. FAC at 8. However, even assuming arguendo that the Bank's attempts to enforce its judgment against Legg are ongoing, and that those attempts qualify as an ongoing proceeding for the purposes of the *Younger* doctrine, the Bank nevertheless fails to explain how the declaratory relief Hanover seeks here would effectively enjoin the Bank's attempts to collect on its judgment against Legg. Whereas Texaco in *Pennzoil* filed suit in federal court to enjoin the state court from enforcing a judgment based on a jury verdict against Texaco, in this action Hanover is not seeking to prevent Legg from enforcing its judgment. Rather, it seeks to establish its right to recover ahead of the Bank. Even if Hanover prevails in this action and makes a third-party claim against Legg, the Bank would be entitled to collect funds against Legg in excess of the funds sought by Hanover, pursuant to the state court judgment.

For the above reasons, the court concludes that *Younger* abstention does not apply.

## B. Doctrine of Prior Exclusive Jurisdiction

The Bank asserts that the court must abstain from adjudicating this matter under the doctrine of prior exclusive jurisdiction. Under that doctrine, a court may not assert *in rem* or *quasi in rem* jurisdiction where a second court has already asserted such jurisdiction over the same *rem* in a proceeding that is ongoing.[19] *Chapman v. Deutsche Bank Nat'l Trust Co.*, 651 F.3d 1039, 1043 (9th Cir. 2011). "Although [the Ninth Circuit] described the prior exclusive jurisdiction rule as both a 'rule of comity' and as a rule of subject-matter jurisdiction, the doctrine is judge-made, not statutory." *Sexton v. NDEX W., LLC*, 713 F.3d 533, 536 n. 5 (9th Cir. 2013). "Because the Supreme Court has recently 'clarified that court-promulgated rules are not jurisdictional' and '[o]nly Congress may determine a lower federal court's subject-matter jurisdiction,' the doctrine of prior exclusive jurisdiction is now best understood as a prudential (although mandatory) common law rule

---

[19] *Quasi in rem* jurisdiction differs from *in rem* jurisdiction only in that *in rem* jurisdiction affects the interests of all persons in a designated property, whereas *quasi in rem* jurisdiction affects the interests of particular persons. *Hanson v. Denckla*, 357 U.S. 235, 246 n.12 (1958). Because courts exercise jurisdiction in the same manner whether the proceeding is *in rem* or *quasi in rem*, the court here uses the term *in rem* to encompass both for purposes of assessing whether the doctrine of prior exclusive jurisdiction applies.

1    of judicial abstention." *Id.* (quoting *Bowles v. Russell,* 551 U.S. 205, 217 (2007)).

2          A court asserts *in rem* jurisdiction when it entertains a suit by a plaintiff who is proceeding

3    directly against the property in question. *Shaffer v. Heitner*, 433 U.S. 186, 199 (1977); *see also*

4    *Pennoyer v. Neff*, 95 U.S. 714, 724-25 (1877). Under California law, a suit only proceeds *in rem*

5    where property is "seized and sought to be held for the satisfaction of an asserted charge against

6    property without regard to the title of individual claimants to the property." *Lee v. Silva*, 197 Cal.

7    364, 368 (1925) (cited in 2 Witkin, *Cal. Proc.* § 243 (5th ed. 2008)). On the other hand, where a

8    party initiates an action merely to "determine the personal rights and obligations of the defendant[]," 

9    the court asserts *in personam* jurisdiction. *Pennoyer*, 95 U.S. at 727.

10         Here, Hanover concedes that the state court did exercise *in rem* jurisdiction over the funds

11   owed the Bank for the purpose of issuing writs to enforce the judgment obtained by the Bank.

12   However, the doctrine is nevertheless inapplicable here because the court does not assert *in rem*

13   jurisdiction in this action. Hanover does not ask the court to seize the funds as part of this action,

14   but rather asks the court to determine its rights to the funds. It is well settled that such actions are

15   properly classed as *in personam. See Commonwealth Trust Co. of Pittsburgh v. Bradford*, 297 U.S.

16   613, 619 (1936) (proceeding to determine rights to funds in a trust was not in rem because it sought

17   "only to establish rights," rather than to "deal with the property and other distribution"); *Princess*

18   *Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456, 466 (1939) ("[T]he principle . . . that the court

19   first assuming jurisdiction over property may maintain and exercise that jurisdiction to the exclusion

20   of the other . . . has no application to a case in a federal court based upon diversity of citizenship,

21   wherein the plaintiff seeks merely an adjudication of his right of his interest as a basis of a claim

22   against a fund in the possession of a state court.").

23         Thus, the doctrine of prior exclusive jurisdiction does not apply here.

24   **C. *Brillhart* Doctrine**

25         The Declaratory Judgment Act authorizes federal courts to "declare the rights and other legal

26   relations of any interested party seeking such declaration, whether or not further relief is or could be

27   sought." 28 U.S.C. § 2201(a). District courts have "unique and substantial" discretion in

28   determining whether to entertain declaratory relief actions under the Declaratory Judgment Act.

1   *Wilton v. Seven Falls Co.,* 515 U.S. 277, 286 (1995).  However, a federal court's discretion to grant

2   declaratory relief "is not unfettered."  *Gov't Emps. Ins. Co. v. Dizol,* 133 F.3d 1220, 1223 (9th

3   Cir.1998). "Prudential guidance for retention of the district court's authority is found in *Brillhart v.*

4   *Excess Ins. Co. of America,* 316 U.S. 491 (1942), and its progeny."  *Id.*  In *Brillhart*, the Court

5   established that a district court may at its discretion decline to exercise jurisdiction over a claim for

6   declaratory relief where another suit between the same parties, on the same issues, not governed by

7   federal law, is pending in state court.  *Brillhart*, 316 U.S. at 495.  The Court reaffirmed this doctrine

8   in *Wilton*, 515 U.S. at 289-90.

9       The *Brillhart* Court articulated three factors that courts should consider when examining the

10  propriety of entertaining a declaratory judgment action: (1) avoiding needless determination of state

11  law issues; (2) avoiding duplicative litigation; and (3) discouraging "forum shopping."  *R.R. St. &*

12  *Co. Inc. v. Transp. Ins. Co.*, 656 F.3d 966, 975 (9th Cir. 2011).  "Although courts may also consider

13  a number of other factors, the three *Brillhart* factors remain the philosophic touchstone for the

14  *Wilton/Brillhart* analysis."  *Id.* (citations omitted).

15      **1.  State Law Issues**

16      The first *Brillhart* factor is implicated here, as retaining jurisdiction over this case would

17  require the court to determine state law issues.  *But see Chamberlain v. Allstate Ins. Co.*, 931 F.3d

18  1361, 1367 (9th Cir. 1991) (analyzing first *Brillhart* factor as whether federal court must consider

19  particularly "complex state law issues" that may confuse a judge who is not an expert in the law of

20  that state).

21      **2.  Duplicative Litigation**

22      The second *Brillhart* policy justification, preventing duplicative litigation, is inapposite here,

23  because the issue of Hanover's entitlement to the contract funds is not before the state court for the

24  reasons stated above.  Furthermore, the *Brillhart* doctrine is generally inappropriate in cases where

25  the plaintiff brings not only declaratory judgment claims but also claims for monetary damages,

26  since that would lead to duplicative litigation.  "[T]he discretionary *Wilton/ Brillhart* standard does

27  not apply to actions for damages, and the court may not rely solely on this standard to dispose of

28  claims for damages."  *R.R. St. & Co.*, 656 F.3d 966 at 977.  "Claims that exist independent of the

United States District Court

For the Northern District of California

1  request for a declaration are not subject to the Declaratory Judgment Act's discretionary

2  jurisdictional rule" but instead invoke the virtually unflagging obligation of the district court to hear

3  jurisdictionally sufficient claims." *Id.* (quoting *Colorado River Water Conservation District v.*

4  *United States*, 424 U.S. 800, 817 (1976)).  Thus, "if the same action contains claims for both

5  monetary and declaratory relief, the district court should not, as a general rule, remand or decline to

6  entertain the claim for declaratory relief." *Id.* at 976.  This outcome "avoid[s] piecemeal litigation."

7  *Id.* at 977.

8      Here, Hanover brings claims for monetary damages in this litigation, along with its claim for

9  declaratory relief.  The Bank urges the court to apply the standard to all of Hanover's claims, citing

10  *Royal Indem. Co. v. Apex Oil Co., Inc.*, 511 F.3d 788, 793-94 (8th Cir. 2008), which states that "a

11  court may still abstain in a case in which a party seeks damages as well as a declaratory judgment so

12  long as the further necessary or proper relief would be based on the court's decree so that the

13  essence of the suit remains a declaratory judgment action."  To determine whether such

14  circumstances exist, "[t]he appropriate inquiry for a district court in a Declaratory Judgment Act

15  case is to determine whether there are claims in the case that exist independent of any request for

16  purely declaratory relief, that is, claims that would continue to exist if the request for a declaration

17  simply dropped from the case." *Snodgrass v. Provident Life & Acc. Ins. Co.*, 147 F.3d 1163, 1167-

18  68 (9th Cir. 1998) (finding district court erred in concluding that dispute was "purely, or even

19  primarily, a 'declaratory' actions" where claims also included breach of contract, violation of state

20  insurance and consumer laws, and tort claims).  The court has described Hanover's theories for its

21  conversion and money had and received claims; both of those claims could still be brought

22  independent of any request for declaratory relief.  Thus, this factor counsels against the application

23  of the *Brillhart* doctrine.

24      **3.  Forum Shopping**

25      Dismissing Hanover's claim for declaratory judgment would not satisfy the third *Brillhart*

26  policy rationale, discouraging forum-shopping.  Generally, this rationale applies when a party files a

27  suit in federal court in reaction to a pending state court suit on the same issues, seeking a declaration

28  that would influence the outcome of the state litigation.  *See Continental Cas. Co. v. Robsac*

United States District Court

For the Northern District of California

1   *Industries*, 947 F.2d 1367, 1371-73 (9th Cir. 1991), *overruled on other grounds* by *Gov't Emps. Ins.*

2   *Co.*, 133 F.3d at 1220 (application of *Brillhart* doctrine was appropriate to discourage forum-

3   shopping where insurer sought declaratory relief in federal court in reaction to non-removable state-

4   court suit on same issues); *R.R. St.*, 656 F.3d at 976 ("We have instructed that "federal courts should

5   generally decline to entertain reactive declaratory actions." ).  However, as already discussed, it is

6   unclear how the outcome of this litigation would affect the pending state court action, as the matters

7   that were or are in consideration in state court affect different parties and different issues.

8       Accordingly, the court finds that the *Brillhart* doctrine does not apply.[20]

9   **D.  *Colorado River* Doctrine**

10      Finally, the Bank also urges the court to abstain from deciding this case under the doctrine

11   outlined in *Colorado River*, *supra* Section III.C.2, 424 U.S. at 817-18.  The *Colorado River* doctrine

12   pertains where a federal court has exercised jurisdiction contemporaneous with a state court over

13   actions related to the same factual matter.  *Id.* at 817.  The doctrine operates as only a "narrow

14   exception to the virtually unflagging obligation of the federal courts to exercise the jurisdiction

15   given them," and therefore applies only in "exceedingly rare" circumstances.  *Smith v. Ctr. Ariz.*

16   *Water Conservation Dist.*, 418 F.3d 1028, 1033 (9th Cir. 2005) (citing *Holder v. Holder*, 305 F.3d

17   854, 867) (internal quotation marks omitted).

18      When a district court grants a stay under the *Colorado River* doctrine, it "presumably

19   concludes that the parallel state-court litigation will be an adequate vehicle for the complete and

20   prompt resolution of the issues between the parties."  *Id.* (internal quotation marks and citations

21   omitted).  Accordingly, district courts may not grant such a stay when there exists "substantial doubt

22   as to whether the state proceedings will resolve the federal action."  *Id.* (citing *Intel Corp. v.*

23   ────────────────────

24      [20]  Because the court finds that the *Brillhart* factors considerations do not counsel the court to
    decline to hear this case, it need not reach the issue of whether *Brillhart* only applies where the same

25   parties are involved in both federal and state court cases.  *See Brillhart*, 316 U.S. at 495 (stating
    *Brillhart* doctrine as counseling against "a federal court . . . proceed[ing] in a declaratory judgment suit

26   where another suit is pending in a state court presenting the same issues, not governed by federal law,
    between the same parties").  *But see Polido v. State Farm Mut. Auto. Ins. Co.*, 110 F.3d 1418 (9th Cir.

27   1997), *overruled on other grounds* by *Gov't Emps. Ins. Co.*, 133 F.3d. at 1220 (*Brillhart* may still apply
    even if one of the litigants in the federal court action was not a party to the related state court action).

28

*Advanced Micro Devices, Inc.*, 12 F.3d 908, 913 (9th Cir. 1993)).  Courts ask whether substantial doubt exists that the federal issues will be resolved in the state proceeding as of their decision on whether or not to apply the doctrine.  *Smith*, 418 F.3d at 1033 (inquiring whether it appeared likely that the state court proceeding would address the federal issues "at the time of the district court's decision").

Here, for the reasons stated above, there is indeed "substantial doubt" over whether the ongoing state court trial involving Legg's subcontractors will resolve Hanover's claims in this matter.  The Bank notes several times that Hanover could have intervened in the state court actions. Even assuming that Hanover could have intervened in the state court actions to bring a claim against the Bank to determine their rights to contested property, there is no general requirement that a federal litigant intervene in a state court action raising similar issues.  Furthermore, the Bank makes no attempt to connect Hanover's failure to intervene with any of the *Colorado River* considerations or point the court to a case that does so.  The court thus declines to abstain on the basis of the *Colorado River* doctrine.

### IV. CONCLUSION

For the foregoing reasons, the Bank's motion is **denied.**

IT IS SO ORDERED.

Dated:  September 22, 2014



IT IS SO ORDERED

DONNA M. RYU
United States Magistrate Judge